IS

AO 91 (REV.5/85) Criminal Complaint                    AUSA Daniel Collins (312) 886-3482

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**
7-27-12
JUL 27 2012
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

GUAN YING LI,
     also known as "Henry Li"

**CRIMINAL COMPLAINT**

CASE NUMBER: **12 C R 0577**

MAGISTRATE JUDGE MASON

**UNDER SEAL**

    I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: From in or about March 2011 to in or about July 2012, at a location in the Northern District of Illinois, Eastern Division, and elsewhere, GUAN YING LI, also known as "Henry Li," defendant herein:

Count One

    Attempted to knowingly provide material support or resources, namely, tangible property, communications equipment, weapons, and explosives, as those terms are defined in Title 18, United States Code, Sections 2339A(b) and 2339B(g)(4), to a foreign terrorist organization, namely, Sendero Luminoso, also known as the Shining Path, which was designated by the Secretary of State as a foreign terrorist organization on October 8, 1997, and redesignated on October 8, 1999, and October 5, 2001, pursuant to Section 219 of the Immigration and Nationality Act, and has remained so designated through and including the present time, knowing that Sendero Luminoso, also known as the Shining Path, was a designated terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)), that Sendero Luminoso, also known as the Shining Path, had engaged and was engaging in terrorist activity (as defined in Section 212(a)(3)(B) of the Immigration and Nationality Act), and that Sendero Luminoso, also known as the Shining Path, had engaged and was engaging in terrorism (as defined in Section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339B(a)(1).

Count Two

Knowingly acquired, transferred and exported parts, namely, five thermal batteries, designed for use in assembling and fabricating an anti-aircraft missile system, in violation of Title 18, United States Code, Section 2332g(a)(1)(C).

I further state that I am a Special Agent with the Department of Defense, Defense Criminal Investigative Service, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
Michelle H. Goldsmith
Special Agent, Department of Defense, Defense Criminal
Investigative Service

Sworn to before me and subscribed in my presence,

July 27, 2012                                          at      Chicago, Illinois
Date                                                            City and State

MICHAEL T. MASON, U.S. Magistrate Judge
Name & Title of Judicial Officer                          Signature of Judicial Officer

UNITED STATES DISTRICT COURT    )          **UNDER SEAL**

)    ss

NORTHERN DISTRICT OF ILLINOIS  )

## AFFIDAVIT

I, MICHELLE H. GOLDSMITH, being duly sworn, state as follows:

1.    I am a Special Agent with the Department of Defense, Defense Criminal Investigative Service (DCIS) and have been so employed since 2012. My current responsibilities include the investigation of illegal trafficking of weapons and other goods and technology. Prior to becoming a Special Agent with DCIS, I was employed as a Special Agent with the United States Postal Service, Office of Inspector General (USPS-OIG), for approximately 8 years. Prior to being a Special Agent with OIG-USPS, I was a Special Agent for the Georgia Bureau of Investigation, where I received training at the Georgia Public Safety Training Center. I also have received training through the Federal Law Enforcement Training Center, and have a Masters degree in Forensic Psychology.

2.    This affidavit is submitted in support of a criminal complaint alleging that Guan Ying Li, also known as "Henry Li," has violated Title 18, United States Code, Section 2339B(a)(1) and Title 18, United States Code, Section 2332g. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging LI with attempting to knowingly provide material support to a designated foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B(a)(1), and knowingly acquiring, transferring and exporting parts designed for use in

1

anti-aircraft missiles, in violation of Title 18, United States Code, Section 2332g, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.     This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents and in law enforcement records, my review of emails and consensually recorded conversations, and my training and experience as well as the training and experience of other law enforcement agents.

4.     As discussed below, this investigation has involved a federal law enforcement agent acting in an undercover capacity (UC), who communicated with Li by email and in recorded telephone conversations. Quotations from English language emails in this affidavit are as they appeared when they were sent or received, including typographical and other errors. Further, the quoted material from the recorded conversations is taken from draft, not final transcripts.     The summaries below do not include all potentially criminal communications that have occurred during this investigation or all statements or topics covered during the course of the communications described below.

Summary

5.     Defendant Guan Ying Li, also known as "Henry Li," is a 45-year-old national of Hong Kong and an international arms trafficker. According to communications received from Li, as described below, Li is affiliated with Northwest Technology Company, which

2

is located in Hong Kong. Li has worked with factories located in China that manufacture military equipment, and has offered to sell, and sold, a variety of military equipment. According to a resume sent by Li,[1] Li attended the University of North Carolina, Charlotte, and received a Bachelors Degree in Electrical Engineering. Further, Li was employed by a company in New Jersey as a sales manager for approximately two years.

6.      Sendero Luminoso, also known as the Shining Path, was designated by the Secretary of State as a foreign terrorist organization on October 8, 1997, and redesignated on October 8, 1999, and October 5, 2001, pursuant to Section 219 of the Immigration and Nationality Act. According to a report on "Foreign Terrorist Organizations" issued by the Congressional Research Service, the Shining Path is a leftist organization in Peru whose original goal was to overthrow the government and social structure of Peru and neighboring countries and replace them with a Maoist socialist system. The group opposes any foreign influence in Peru, including that of the United States. According to the Report, the Shining

---

[1]      A federal search warrant was obtained for one of Li's email accounts. In an email sent to a third party unrelated to this investigation on or about August 18, 2011, Li attached his resume. The resume identified himself as "Henry Guan Ying Li." Li claimed to be fluent in Cantonese, Mandarin, English and Indonesian. Additionally, a copy of a portion of Li's passport was obtained from another email obtained through a federal search warrant. The passport identified Li as "Guan Ying Li" with a date of birth in February 1967. Further, according to records maintained by the United States government, Li obtained a student visa in the name of "Guan Ying Li," and, upon entry into the United States in 1991, listed his address as UNC Charlotte.

Path attempted to bomb the United States Embassy in Lima in 1990, and is believed to be responsible for a 2002 car bomb attack near the United States Embassy.

7.     As discussed further below, starting in or about March 2011 and continuing to in or around July 2012, Li communicated through email and by telephone with a law enforcement agent acting in an undercover capacity. After the UC informed Li that he was procuring weapons and other military equipment on behalf of the Shining Path and that its members intended to use the weapons and equipment to attack and kill Peruvian military personnel, as well as United States military personnel, Li arranged for the sale and delivery of component parts and equipment for use by the Shining Path, including (a) five thermal batteries designed for use in the Hon Ying-5 (HN-5) surface-to-air, man-portable, air-defense weapon system; (b) four SHR-PLV200 portable infrared night vision systems, (c) eight Chinese People's Liberation Army ("PLA") Type 99 Paratrooper Assault Harnesses, (d) eight PLA 65 Paratrooper Backpacks, (e) eight PLA WJQ-308 shovels, and (f) two PLA TBR-115 VHF Radios. The HN-5 weapon system is an anti-aircraft missile launcher capable of making tail-on engagements against jet aircraft or head-on engagements against propeller-driven aircraft and helicopters under visual aiming conditions. The weapon has seen combat use in a number of regional conflicts.

Probable Cause

8.     On or about May 4, 2010, Individual A emailed a government agent acting in an undercover capacity (UC) through an internet-based business-to-business trading

platform. Individual A stated that he was affiliated with Northwest Technology Company located in Hong Kong and initially inquired about obtaining gyroscopes. In later correspondence with the UC, Individual A stated that his company "source[s] air parts and hard to find items." During continued email correspondence in or about May and June 2010, the UC informed Individual A that he was seeking, among other equipment, thermal batteries for the Hong Ying 5 model. The Hon Ying-5 (HN-5) is a Chinese-made variant of the Russian Strela, or "SA-7" surface-to-air, man-portable, air-defense ("MANPAD") weapon system.

9.    In response to the UC's request for the thermal batteries, Individual A provided two schematic diagrams for batteries for the SA-7 weapon systems and eventually a price quotation. On or about June 14, 2010, the UC responded that "the prices seem a little high." After some additional correspondence, communications between Individual A and the UC ceased in early July 2010 until the following year.

10.    On or about March 9, 2011, the UC emailed Individual A, stating in pertinent part, "I know it has been a while but now I have a new requirement for the same batteries for HN-5B. Can you please provide me with an updated price quote for (3) batteries? Please let me know what the lead time will be as well."

11.    On or about March 11, 2011, the UC received an email from "Henry Li" using the address gyl199@yahoo.com.hk. Henry Li stated that he was a "colleague of [Individual A] and will work on this battery project." According to records provided by Yahoo, the

5

subscriber for this account is Henry Li with the same date of birth listed on his passport (discussed in footnote #1 above).[2]

12.     On or about March 19, 2011, Henry Li emailed the UC, stating in pertinent part, "For the HN-5B stock item, we will need to talk to original maker in China, but after discussion with them, they told us due to regulatory issue, they cannot export directly to U.S. So, do you have 'consignee' in other country, may be some place in South America-Mexico....etc." In this same email, Li provided a "mobile" telephone number to the UC. The UC responded by email that he had spoken to Individual A about shipping the thermal batteries to the US. On or about March 21, 2011, Henry Li responded in pertinent part, "For the stock items from China, it is easier to ship to other country." Li also asked about the UC's location, "which city in U.S?"

13.     On or about March 23, 2011, the UC responded that "[o]ur company is located in a suburb of Chicago." The UC reiterated that he was seeking samples of the HN-5B batteries. On or about March 25, 2011, Li responded, providing a price quotation for a minimum required quantity of 100 thermal batteries. The UC responded that the minimum

---

[2]     As discussed throughout this Affidavit, the UC communicated with Li from March 2011 to July 2012 using one of two email addresses. According to records provided by Yahoo and Google, the subscriber for both accounts was "Henry Li." Li identified himself as "Henry Li" or "Henry" in the substantial majority of email communications with the UC. Further, based on the fact that most of the emails were replies to prior messages and discussed the same topics as prior messages, there is probable cause to believe that Li was the sender and recipient of the emails discussed herein.

6

required quantity was too high, and that he needed samples before purchasing untested products because of the "types of customers who are seeking to purchase them" and his wish not to "create new enemies." On or about April 1, 2011, Li emailed the UC, stating that he had located a "China supplier" who might be able to provide samples.

14.    On or about April 20, 2011, Li emailed the UC, forwarding specifications for the thermal batteries and passing on a query from the factory's engineer about "environmental requirement," "temperature requirements" and other factors. On April 22, 2011, the UC responded, asking if the factory manufactured to military specifications for the HN-5B thermal batteries. On April 22, 2011, Henry Li emailed the UC, stating that the factory from whom he would obtain the thermal battery specialized in military batteries and would manufacture the thermal batteries to Chinese military standards. In response, the UC emailed Li and stated, "[t]he batteries will be stored and used in a tropical/coastal environment."

15.    On or about April 27, 2011, Li emailed the UC, stating that "the factory just complete the costing evaluation." Li added "but since I need to have slight explanation to the facotry about the place for using such item. pls help me to explain. since you also export to your customer, is it in South America or Middle East region. ( as u mention is tropical & coastal region)." In response, on or about April 29, 2011, the UC responded in pertinent part:

> I understand that your customer may want to have some sort of end use or end user information regarding the batteries and maybe the equipment list I sent you. First of all I will explain that I am a business man and my job is to supply my clients with as much material or equipment I can offer them. This is my

job. Right now revolution is happening in different part of the world and there is a market for different types of supplies and arms. When I was in contact with [Individual A] based on his original request for US made gyroscopes, I was also approached by my customer who occasionally sells equipment and arms to a Communist group in Peru, the Communist Party of Peru also known as the Shining Path. Some countries like the US calls them terrorists but other countries believe in their revolutionary beliefs. . . . we need to be careful because this is a dangerous business. I would like to discuss with you what type of information your people will need in order for you to place the order. I will contact you shortly.

16.     On or about April 29, 2011, the UC telephoned Li at the mobile number that Li earlier had provided to the UC.[3] This call was recorded. In pertinent part, the UC stated, "I just sent you an email and I was, I was being very um, I explained everything. So I didn't want to say . . . I didn't want to say a lot on the telephone so I sent you an email." After Li responded "okay," the UC continued, in pertinent part, "you tell me what you think we should do or say and then we figure, then we will figure it out." In response, Li stated, "Yeah, or I can or I can make up something, but you know, [Unintelligible ("UI")] make up something but uh, my uh, my [UI] and the reason I'm [UI] about so. I don't want to make some uh, mistake and uh, [UI] because, because [UI] and uh, I send [UI] license, it's uh, U.S. State Department. It's a lot more complicated, but I think [UI] it's not too complicated.

---

[3]     In the April 29, 2011 recorded call, as well as all subsequent calls with the UC, Li used the same mobile number which he provided to the UC in email correspondence. In each of the calls, Li self-identified as "Mr Li," and/or "Henry." Further, the UC recognized the male voice who identified himself as "Mr Li" and/or "Henry" to be the same in each of the recorded conversations described herein. Additionally, as described herein, in a number of the phone calls, Li acknowledged having sent or received emails discussed herein.

8

That's why [UI] something." During this call, the UC stated, "I don't want to create any problems or anything, but look at the email first and then we can discuss you know, via email," to which Li responded, "Yeah, yeah, okay, that is good."

17. On or about April 29, 2011, Li emailed the UC, stating "Thanks for your call last evening." Li continued, "Now, we have a better picture for the project, and will be able to handle the query from the factory. For the end-user in South America, our Govt. will be able to export to those region. Basically, South America is the traditional market for China export. May be we can explore more export opportunity to those regiion. . . . We totally agreed with you point of view and hope to cooperate with you to explore new market."

18. After receiving another email from Li with a price quotation for the batteries, the UC responded to Li on or about April 29, 2011 by email. The UC stated in pertinent part, "It was nice to speak with you today. . . . The price of $7650 for battery B seems high, will you accept $1300.00 per unit, $6500 total?" On or about April 30, 2011, Li responded in pertinent part, "we can provide a discount price for USD6600. for total of 5 samples."

19. On or about May 2, 2011, the UC emailed Li, stating in pertinent part:

> Regarding the batteries, the end user has a question regarding the batteries for the HN-5B. The end user wanted to know if the batteries will be manufactured with some sort of Chinese factory markings or codes on the exterior portion of the battery. I found out that the end user has talked about plans to use this equipment for use against the current government and US personnel in the country I mentioned in my email. I know that the equipment that I will be purchasing from you for the end user cannot be traced to any one person. I know that this is a sensitive business, but we need to be sure that the batteries will not show our involvement or your suppliers markings in the actions taken by the end user.

9

20. On or about May 3, 2011, Li responded:

Thanks for your email advise.

It is good to cooperate with you for the South America market, since this is your territory. We have some special item on hand and I think this will suit your customer need in the tropical forest environment. I will send the info. to you soon.

For the battery, your point is very good, it will be better leave no marking and make it un-traceable. I have discussed with the factory and they will manufacture it NOT showing any maker name & code on the exterior.

21. On or about May 5, 2011, Li further advised, in pertinent part:

For the battery issue.
- factory side confirmed acceptance of NOT showing any name or marking on the surface.
- if sample order is OK, then we can proceed for discussion on the name on PI and delivery item name on forwarder slip.

22. On or about May 16, 2011, the UC contacted Li by telephone at the same number that Li earlier had provided. This call was recorded. During the call, Li confirmed his receipt of a wire transfer from the UC for the purchase of other equipment, as discussed in paragraphs 61 to 65 below, and indicated that he had shipped certain items and would be shipping other items in a few days. As to the thermal batteries, Li confirmed that he had spoken with the factory and made sure that the thermal batteries would have no markings. Li asked the UC if he had experience with the end user and stated that the UC should "be careful." The UC reiterated that he was working with a group in Peru "that we talked about in my email," and "they're looking to buy . . . other materials, other arms from us." The UC informed Li that he would be traveling to meet with his customer.

23. After Li inquired whether there would be interest for thermal imagers, the UC reiterated concern about "traceability" due to the fact that "these guys are going to uh, you know uh, target or, or kill, you know, people like in, in their country or U.S. people over

10

there. You know, we don't want that stuff coming back to us." Li responded, "yeah, which, which would be un, untraceable or something." Li further stated that he would look for a model of thermal imagers without a company name. Later in the conversation, Li add that he would send "people to come and train you" because the "technology . . . is very difficult."

24.     In this same recorded telephone conversation, Li stated that he had created "another email account especially for communication with you [the UC]." Li explained that "we can talk more securely, another [UI] email to you . . . So, I, I think that you should be more, I think we need to be careful and more safely, right? Do you agree?" The UC agreed.

25.     Li further added that he was familiar with people getting into "big, big trouble," which based on my review of the communications and my training and experience, I understand as a reference to getting arrested. In particular, Li mentioned the case of Viktor Bout, an international arms trafficker who was arrested in Thailand and extradited to the United States after his indictment for trafficking in MANPAD systems and providing material support to a foreign terrorist organization. When the UC mentioned export laws, Li responded "yeah you need to get around them."

26.     Near the end of the May 16, 2011 telephone conversation, Li stated "I've got the new gmail and I will email to you with, uh, with my mobile number that you can talk [UI] meeting."

27.     That same day, the UC received an email from henryhk33@gmail.com. Included in the email was the mobile number at which the UC had contacted Li on both April 29, 2011 and May 16, 2011. According to records provided by Google, the subscriber for this account is Henry Li. In the email, Li identified himself as "Henry Li" and stated:

> It was good to have a thorough discussion with you last night. Then we can formulate our direction & strategy for the South America market. From now on. we can also communicate via this email address.

28.     On or about May 25, 2011, the UC emailed Li and stated in pertinent part:

11

Regarding my meeting and discussions with the end user. It was very interesting discussion and I have a better idea of what type of military equipment that the end user is looking to acquire. They will be sending me the funds for the five batteries within the next week. Once I receive the funds from the end user, I will wire you the deposit. Should I wire the funds to the same bank account? During my discussions with the end user, it seems like the end user is very concerned about the "markings issue" with the batteries. The end user said that he was concerned about the tracability issue. Based on what you have told me, I reassured him that the batteries will not have any markings. The end user told me that they have attacked and killed Peruvian military soldiers and that have conducted operations (attacked) US military personnel in the rural regions of Peru. They plan on doing some more operations/attacks against the Peruvian and US military personnel in order to expel them from their area of operations. The end user said that he needs to supply their revolutionary soldiers with updated equipment and arms. The end user also told me that they shot down a Peruvian helicopter a year ago but he didn't want to say how they shot it down. Very interesting.

* * *

Please let me know if you have some additional equipment or sourcing ideas for my customer. It looks like I will be traveling to Eastern Europe in two weeks on behalf of the end user to source their requirements.

29.     In response, Li emailed the UC on or about May 26, 2011:

It was good to heard your news after the trip.

This meeting with your customer proved to be very useful. Since after this meeting, we will have a better insight about their operation and so we can come up with better idea on the selection of the right equipment for them. I will have a more detail discussion with a PLA military company about the selection of suitable equipment. Once I have a sourcing idea, I will discuss with you.

* * *

For the end-user operation. I guess they shot down the helicopter by HN-5B or some other multiple rocket launcher. So, we can think of some equipment to target helicopter as well.

12

30. On or about May 27, 2011, the UC and Li spoke by telephone. This call was recorded. When Li inquired about the UC's meeting with the customer, the UC asked Li if he had received the above-described email, to which Li responded "yeah, I received your email and [UI] and uh, [UI] understanding about uh, operation [UI] for them." The UC responded, "if you have any other ideas or if you can source any other uh, equipment." Li stated, "I have something on my mind. I will need to confirm with [UI] company and the, and the supplier then. Uh, I think uh, in a couple days then I will write another email to you about some other additional equipment that I think may be useful to them." Li later added, "I think [UI] I have a better understanding and u, I will try to find some additional equipment that will match their list and uh, and operations."

31. In the same telephone conversation, Li told the UC that he would be making arrangements to send the thermal batteries and the radios that the UC had ordered.

32. On or about May 30, 2011, Li emailed the UC, stating in pertinent part:

> After further study and discussion with the supplier.
> I found below equipment might be useful for the customer.
> -telecommunication encryption system
> -developed by China Military Research Institute for Telecommunication.
> originally used by China's navy & helicopter.
> -due to the nature of your customer's business & operation, so they should
> need a more secure network. to prevent interception from their opponent.
>
> * * *
>
> If you find this a feasible equipment to promote.
> pls advise, I will discuss further with the supplier.

13

I will have more equipment to discuss with you soon, once after I get more info. from my associate.

33.  On or about May 31, 2011, the UC responded, stating in pertinent part, "thank you for suggestion. I agree from an operational prospective that this would greatly enhance their communications security especially since they would be operating against US advisers as well." That same day, Li responded describing an encryption system for different applications and recommending one for radio communications.

34.  On June 3, 2011, Li emailed the UC, stating in pertinent part:

> After thorough discussion with the Battery supplier, I inform them we will place payment to them soon for the 5 sample order. They also interested to supply the other accessory parts for HN-5B to us, since they also has experience for the HN-5B production.
> so they can supply some other parts to us on bundle basis.
> As you mention before, the end-user also need below parts.
> - grid lock [grip stock]
> - HN-5B ammunition
>
> * * *
>
> For other part: (HN-5A)
> They can supply us for HN-5A. (Whole system).
> but they send to us in module basis. then we can do the assembly in South America.
> The supplier will teach me to assemble the system, then we can transfer the technology to the end-user, so they can set up the assembly line in South America.
> Then they can have good supply for such system for themselves and can also do the export business for the HN-5A to other South America region.

35.  On or about June 4, 2011, the UC responded, "[t]hank you for the options. . . . My end user is definitely looking to stock and increase their supply of a variety of arms."

14

The UC added, "[a]s a side note, I believe that the HN-5A system should be good enough against the Peruvian or US military helicopters and other low performance aircraft. I am not completely familiar with the operation of the HN-5A system as well. I think I would like to learn more about the system as well"

36. On or about June 7 and 8, 2011, Li sent three separate emails about four separate weapons. First, Li sent an email about the HN-5 MANPAD system. Li stated, "pls refer to attached picture for the HN-5A." Attached to the email are two photographs depicting individuals in military gear aiming surface-to-air missile launchers skyward. Li also provided technical data on the HN-5 system, stating in part "[t]he system consists of the missile, a reusable tube launcher, and a thermal battery. The missile's seeker is fitted with a filter to reduce the effectiveness of decoying flares and to block IR emissions." Li also stated, "I will send separate email about other items we can obtain from other China Military company."

37. In the second email, Li emailed the UC about two anti-tank rockets, attaching information about a 40mm Strike Rocket Shell and a 35mm Automatic Grenade Launcher. Li explained:

> For the end-user operation, they might need to target tank or fleet of armored vehicle. The equipment is
> -portable anti-tank
> -anti-armored vehicle.
> Please discuss with the enduser and check which one is useful, then we can proceed further for price quote and lead time checking. . . . If the customer need more of this anti-tank equipment, we might focus to export more this equipment.

15

38.     In the third email, Li also provided information about a "4th type of equipment, which is 40mm Rocket ( a newer version of anti tank weapon)– for armor penetration. This equipment is supplied by the same manufacturer for the previous 3 portable euqipment." Attached to this email was a specification sheet for this weapon.

39.     In response, the UC emailed Li: "Thank you for the equipment lists. . . . As I mentioned before, the end user spoke in general for their need to defeat and destroy the local Peruvian and US forces operating in their area. . . . I know that there are some US military helicopters/aircraft in Peru staffed with US military advisors. The end user explained that the Peruvian and US helicopters are their biggest threat based on their ability to deploy troops in the end user's area of operation."

40.     On or about June 8, 2011, Li responded, "[i]t was good to know that we just find the equipment just right on time, then we can provide the whole package to the end-user. You are right, we will need to 'educate' the end-user on what type of equipment for them. . . . pls recommend below system . . . this system can also target armed helicopter, so should be good for them."[4]

_____

[4]     Throughout June 2011 and the following months, Li discussed with the UC the sale and export of the 4 different types of weapons systems. On or about June 16, 2011, Li stated to the UC that he mentioned to his supplier that the enduser was a "political organization" and explained that they were concerned about how to export the weapons to Peru. Li asked "can the enduser use 'money' to get some import licenses/ or any form of DoD paper. (pretending to be the goods for DoD rather than other political organization)?" Based on my review of this and other communications, as well as my training and experience, I understand this to be a reference to bribing a foreign official. The discussion about bribing a foreign official continued over the following months. For

16

41.     Between June 8, 2011 and June 12, 2011, the UC and Li exchanged emails addressing the specifications for the thermal batteries, as well as the payment and delivery terms for those items.

42.     On or about June 13, 2011, Li emailed the UC and attached a pro forma invoice for the purchase of five thermal batteries for the HN-5A MANPAD system. In response, the UC emailed Li and asked "will the manufacturer still be able to produce the thermal batteries without any exterior markings (per the end user's request)? Also, The PI lists shipment via air to the US. Are you planning to send the the samples directly to my company?" On or about June 14, 2011, Li responded, stating "about the exterior marking issue, I will stress this point on the PO as a Remark, just to remind them. They also told us will be able to do this, besides, they also need to keep this order in low profile and make it un-traceable." As to the location of delivery, Li stated:

> Since your are already the main contact window with the end-user, so for your security, you better NOT be the consignee, neither your company. I suggest the safest way to send to your company office in Eastern Europe. Then the consignee can be your Associate in Eastern Europe. You can travel there to carry out preliminary checking, then send to the enduser from Eastern Europe.

43.     Between June 22, 2011 and June 27, 2011, the UC and Li exchanged emails about the payment of a deposit for the MANPAD thermal batteries.

---

example, on or about June 17, 2011, Li stated to the UC "we can suggest the end-user pay some money to Army Officier and ask them to sign & Chop the End-user Cert. with the DoD( Dept. of Defense) chop. Then it is a legal Document." In this same email, Li provided price quotations for an automatic grenade launcher, under barrel grenade launcher, and two 40mm rockets.

44.    On or about June 24, 2011, Li and the UC spoke by telephone. This call was recorded. Among other topics, Li and the UC discussed the status of the wire transfer for the down payment for the thermal batteries. Li told the UC that the factory wanted to finalize the transaction for the thermal batteries before providing other parts, such as gripstock for the missile launchers and ammunition. Further, Li stated that "they are willing to work with us and [UI]. That's why they told us they would dismantle the, the whole system to us and send it part by part. And then they would teach us how to assembly [UI]. So the first thing [UI] let you know the end user [UI] and uh, they would like to really make sure the battery they're supplying to the end user is suitable for them. And then they will talk about the [UI] and some other things." When the UC asked to clarify whether the factory would send the whole system, Li explained "just piece by piece. . . . They just sell, sell us the components . . . And they will teach us how to assembly [UI] the whole system."

45.    On or about June 24, 2011, the UC sent a wire transfer of approximately $3,400 to Northwest Technology Company's account at Hang Seng Bank, Ltd., Hong Kong, as a down payment for the thermal batteries. On or about June 27, 2011, Li sent the UC an email and "confirmed the arrival of USD3380, and we have activated the order for the 5pcs samples."

46.    On or about July 14, 2011, Li emailed about the status of the manufacture of the thermal batteries, and stated that "[t]his battery supplier is the same supplier for HN-5A gripstock & ammunition. That's also the reason why they will prefer to proceed for gripstock & other parts after they deliver the 5pcs battery samples. They can do this without the End-user Cert., that's mean they are using the 'backdoor' method. For such case, they will try several way to bypass the regulatory issue, if one way is unsafe, then they will try other way."

47.    After additional email exchanges, on or about July 29, 2011, Li emailed the UC and informed him that he would be ready to ship the five thermal batteries early the following week. Li requested that the UC provide an address for a foreign consignee for delivery. On

or about August 1, 2011, the UC emailed Li and provided a business address located in Central America.

48. On August 3, 2011, Li emailed the UC, attaching photos of the five thermal batteries and requesting the remainder of the down payment. On or about August 5, 2011, the UC made a wire transfer of approximately $3,390 Northwest Technology Company's account at Hang Seng Bank, Ltd., Hong Kong, as the remaining down payment for the batteries. On or about August 8, 2011, Li emailed the UC and "confirmed the arrival of USD3372."

49. On or about August 18, 2011, Li emailed the UC, and provided a DHL tracking number for the shipment of the five thermal batteries. According to DHL shipping documents, on or about August 18, 2011, a shipment of five thermal batteries for the HN-5A MANPAD system was sent from a business address in Hong Kong to a business address in Central America that the UC earlier had provided. The batteries were received on or about August 24, 2011.

50. Agents arranged the transport of the thermal batteries to the United States. In or about October 2011, the thermal batteries were inspected by the United States Defense Intelligence Agency (DIA), who determined that the batteries were operational and able to provide the proper voltage to power an HN-5 class of missile systems. DIA further used two of the thermal batteries to power and operate an HN-5 missile system in the pre-launch mode.

51. On or about August 24, 2011, Li emailed the UC and asked whether the UC's associate received the goods. On or about September 1, 2011, the UC emailed Li and confirmed receipt of the thermal batteries. The next day, Li responded, stating "[t]hat is good. Hope you will have a successful trip in Peru. Also, pls be careful for this delivery, even the battery is small, but pls try to avoid hand-carry on the plane"

52. On or about September 19, 2011, the UC emailed Li and stated that he had returned from Peru. The UC stated "I met with the end user and some his people from the revolutionary committee . . . They are waiting for more arms, equipment and training before

they will be ready to strike against government forces and US military personnel in their country." In addition to the HN-5A weapons system, the UC stated that the customer was interested in RPG-7's, Generation III night vision goggles and some of the thermal imaging cameras.

53.     Li responded the same day, and asked "during your stay in Peru, did they show the testing of the battery to you?" Li added, "once we ensure the safe delivery of the battery cargo, we (& battery supplier-HN-5 supplier) are in a safer position to deliver the HN-5 system."

54.     Throughout September 2011 and the following months, Li and the UC exchanged emails regarding the quality of the sample MANPAD thermal batteries and instructions for their use, as well as an order for a larger quantity of these thermal batteries and other parts for the HN-5 weapons system.

55.     On or about September 30, 2011, Li and the UC spoke by telephone. The call was recorded. Li and the UC discussed the thermal batteries, and Li explained that the thermal batteries that were sent were an external battery for the HN-5. After the UC informed Li that the end user had difficulties with their application, Li stated that he would locate and send operation manuals.

56.     Throughout the remainder of 2011 and continuing to in or around July 2012, Li and the UC continued to communicate about the thermal batteries, as well as other equipment, including RPG launchers, automatic grenade launchers, 35mm ammunition, the QW-1 MANPAD system, and two different types of armor-piercing ammunition.

57.     Specifically, on November 25, 2011, Li emailed the UC and stated in pertinent part, "this battery maker is under discussion with a U.S. Armament company for the making of armor penetration bullet . . . I will try to get more info. for this bullet issue and I think this might be a good product for us to promote. Pls advise your idea, about this product potential."

20

58.     On or about December 6, 2011, the UC responded, stating in pertinent part, "[r]egarding the armour penetration ammunition, please keep me posted. The end user in Peru and another customer has expressed interest in purchasing this type of ammunition as long as it can penetrate US military body armour. Let me know any developments on this project."

59.     On or about December 11, 2011, Li emailed the UC and provided six photographs of armor-piercing bullets. Li stated, among other details about the ammunition, "pls refer to attached photo, those item can be produced by the thermal battery cell supplier."

60.     Li and the UC continued communications about the armor-piercing ammunition throughout the remainder of 2011 and in 2012.

*Li provided additional equipment for use by the Shining Path*

61.     In addition to the sale and delivery of thermal batteries for the HN-5B MANPAD weapons systems, Li also provided other equipment to the UC for use by the Shining Path.

62.     Specifically, on or about March 28, 2011, the UC emailed Li and requested a quote for eight PLA Type 99 Paratrooper Assault Harnesses, eight PLA 65 Paratrooper Backpacks, eight PLA WJQ-308 shovels, and three PLA TBR-115 VHF Radios. In separate emails during April 2011, Li provided quotes for the harnesses, backpacks, shovels and radios.

63.     Further, the UC later informed Li that this equipment was destined for use by the Shining Path. Specifically, on or about April 20, 2011, the UC emailed Li: "[m]y customer that is looking for this equipment is the same customer who is looking for the batteries."

64.     On or about May 5, 2011, the UC wired approximately $2165 to Northwest Technology Company's Account at Hang Seng Bank, Ltd., Hong Kong.

65.     On or about May 6, 2011, the UC emailed Li, stating in pertinent part, "you mentioned that you have some other equipment that would be useful in a tropical

21

environment. Please let me know and I can pass it along to some of my customers for their review." On or about May 6, 2011, Li responded, thanking the UC for arranging the wire transfer and stating as follows:

> for some other equipment: we propose to promote the Thermal Imager in South America market, since we are associated with several major China Thermal Imager producer, we have team up some supplier in China and successfully penetrate the market in other region of the World. I believe your customer will be interested in such equipemtn, since they will have a lot of activities in the tropical jungle area. This item will enhance their mobility in day or night. I will prepare some product info. and send to you. Then we can discuss further for the exact move.

On May 9, 2011, Li confirmed his receipt of the wire transfer, and stated "[s]hould be able to consolidate all goods around this Friday. will inform once we dispatch to you."

66.     As described in paragraph 23 above, Li mentioned the thermal imagers in the May 16, 2011 telephone conversation in which the UC and Li discussed traceability in light of the fact that the customer was going to "target" and "kill ... people in, in their country or U.S. people over there." On or about May 17, 2011, Li emailed the UC and stated in pertinent part:

> Per our last night discussion, pls refer to attached product info. for the Thermal Imager products.

> Judging from hte nature of your customer, we suggest to try SHR-PIR20, since this product also used by China's Army for border patrol in Souther part of China(close to tropical zone), It can see via dust, , rain. smog. Should suit the environmental condition of your customer.

67.     On or about May 19, 2011, at an address in the Northern District of Illinois that the UC had provided earlier to Henry Li, one parcel was received via DHL from Northwest Technology Company Ltd., Hong Kong. The parcel contained military gear, namely, eight

22

MJQ308 shovels, eight Type 65 backpacks, and eight Type 99 assault harnesses. The parcel contained a shipping invoice from Northwest Technology Company.

68.    On or about May 22, 2011, Li emailed the UC about chargers for the radios that the UC ordered, stating in pertinent part:

> We got the 2 charger last weekend, and have tested it , it works fine iwth battery.
>
> Then we plan to send the 2 radio unit out to you tomorrow.  now to ensure smooth delivery, we need to think of the declared goods name to put on shipment form.  I think of some names below.
>
> radio samples
>
> mobile radio samples
>
> -camping radio samples
>
> -electronics appliance
>
> -or other..........pls advise if you have other better suggestion.
>
> pls refer to attached photo of goods, it looks MIL application, so I am not sure will there be certain restriction for importing such goods and is there any bandwith control imposed. So, we need to think of a appropriate name to put on.

69.    On or about June 2, 2011, at an address in the Northern District of Illinois that the UC had provided earlier to Henry Li, one parcel was received via United States Postal Service from Northwest Technology Company Ltd., Hong Kong.  The parcel contained two TBR-115 VHF radios, two TBR-115 headsets, and two battery chargers. Further, on or about June 7, 2011, at an address in the Northern District of Illinois that the UC had provided earlier to Henry Li, one parcel was received via DHL from Northwest Technology Company

23

Ltd., Hong Kong. The parcel contained two batteries for the TBR-115 radios and related documentation.

70.　　On or about June 9, 2011, Li emailed the UC asking if there was to be a repeat order for the equipment previously provided. Li stated, "since the previous order of 8pcs should be for samples, their man-power should far exceed this number, so, there will be good chance for them to order more for their team."

*Li Supplied Portable Infrared Night Vision Systems for Use by the Shining Path*

71.　　As discussed in paragraph 23 above, Li recommended Thermal Imagers for use by the Shining Path. On or about November 2, 2011, the UC emailed Li and stated that "the end user in Peru wants to purchase four SHR-PLV200 cameras."

72.　　On or about November 4, 2011, Li emailed the UC and quoted a price "[f]or the Thermal Imager for the Peru customer." Li stated that "we will check on the delivery cost to Panama ( base on previous address)." On or about November 7, 2011, Li emailed the UC and provided a pro forma invoice for the thermal cameras.

73.　　On or about November 14, 2011, the UC made a wire transfer of approximately $2,140 to Northwest Technology Company's account at Hang Seng Bank, Ltd., Hong Kong, as partial payment for the SHR-PLV200 thermal imaging cameras.

74.　　On or about November 16, 2011, Li emailed the UC and "confirmed the arrival of your fund." Li further stated, "[w]e have activate the order, since they are stock items, so delivery time will be fast. Will inform you once ready to deliver."

75.　　On or about November 29, 2011, the UC made a wire transfer of approximately $2,140 to Northwest Technology Company's account at Hang Seng Bank, Ltd., Hong Kong, as the remainder of the payment for the SHR-PLV200 thermal imaging cameras.

76.　　On or about December 2, 2011, Li emailed the UC and stated in pertinent part, "confirmed with the bank yesterday, the fund had arrived. Will proceed to complete payment & prepare for shipment."

77.     On or about January 6, 2012, Li arranged to ship the SHR-PLV200 thermal imaging cameras to a business address in Central America earlier provided by the UC. According to DHL shipping records, the cameras arrived at a sorting facility in Hong Kong on January 6, 2012, and then were shipped from Hong Kong on January 7, 2012. On or about January 8, 2012, the shipment was intercepted by United States Customs and Border Protection at a DHL sorting facility in Cincinnati, Ohio, and the contents were seized. That same day, agents with Homeland Security Investigations inspected the contents and confirmed that there were four SHR-PLV200 portable infrared night vision systems. The parcel, minus the contents, was then returned to DHL for normal processing and delivery to the UC business address in Panama.

*Li Offers to Supply Equipment to Hezbollah*

78.     In addition to providing equipment for use by the Shining Path, Li also offered to sell and deliver equipment for use by another designated foreign terrorist organization, Hezbollah was designated by the Secretary of State as a foreign terrorist organization on October 8, 1997, and redesignated on October 8, 1999, and October 5, 2001, pursuant to Section 219 of the Immigration and Nationality Act.

79.     On or September 7, 2011, the UC emailed Li about the thermal imagers which Li was attempting to sell and asked whether there were instruction manuals in Arabic. The UC told Li "[t]he customer is in Southern Lebanon." The following day, Li replied that the manuals were in English. On or about September 19, 2011, Li emailed the UC and, among other topics, stated that "recently I have discussion with the previous 'Official' supplier for the HN-5 & RPG system, he come up with some idea about Middle East region. . . . hope you will have some good news for the thermal imager for the Lebanon customer." The UC responded the following day, "I will let you know about the thermal imaging cameras. Dealing with some of the people in these revolutionary groups (or terrorist groups as the US government calls them . . . like the Shining Path or Hezbellah in southern Lebanon is not always easy. I know that Hezbellah customers are going to place an order. I'm just waiting

25

on the final quantity and funds." The following day, on or about September 21, 2011, Li responded, stating "[n]ow we can focus on the Lebanon customer, if you found them more serious to place order."

80.    Throughout exchanges in September 2011 and the following months, Li requested updates on this customer – e.g., "wait for your good news on the Lebanon biz" (September 22, 2011); "do you have further news on the Lebanon customer" (October 20, 2011); "for the Lebanon customer, did they confirm the thermal camera order?" (November 3, 2011).

<u>Conclusion</u>

81.    Based on the above, I submit that there is probable cause to believe that from in or about March 2011 to in or about July 2012, defendant Guan Ying Li, also known as Henry Li, attempted to knowingly provide material support to a designated foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B(a)(1), and knowingly acquired, transferred, and exported parts designed for use in an anti-aircraft missile system, in violation of Title 18, United States Code, Section 2332g.

FURTHER AFFIANT SAYETH NOT.


MICHELLE M. GOLDSMITH
Special Agent, Department of Defense,
Defense Criminal Investigative Service


SUBSCRIBED AND SWORN to before me on July 27, 2012.


MICHAEL T. MASON
United States Magistrate Judge

26