UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GUAN YING LI | No. 12 CR 577<br><br>Judge Joan Humphrey Lefkow |

## GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, through JOEL R. LEVIN, Acting United States Attorney for the Northern District of Illinois, respectfully submits its Sentencing Memorandum for defendant Guan Ying Li.[1]

*Summary*

Defendant, at the time a 45-year-old sophisticated Chinese businessperson with a degree from the University of North Carolina-Charlotte, brokered deals to provide sophisticated military equipment to Shining Path knowing that the equipment was to be used to kill Peruvian and US Government personnel. R. 2; R. 64 at 3-6; PSR 14-15. Although defendant sold the equipment to an undercover agent and not terrorists, such luck does not mitigate defendant's desires, abilities, or efforts to facilitate murder and terrorism.

Defendant acquired and sold the undercover agent five thermal batteries designed for use in the Hon Ying-5 (H-5) surface-to-air-, man-portable, air-defense

---

[1] The Presentence Investigation Report is cited as "PSR," the Government's Version is cited as "GV," and defendant's sentencing memorandum is cited as "Br." Other docket entries are cited as "R." followed by the docket number. Each of these abbreviations are followed by the page number unless otherwise noted.

weapon system (known as "MANPAD") for the purpose of allowing Shining Path to shoot down helicopters, including helicopters carrying U.S. personnel.[2] R. 64 at 2-6; R. 2 at ¶ 29, 39, 40. Defendant also sold eight PLA[3] Type 99 Paratrooper Assault Harnesses, eight PLA 65 Paratrooper Backpacks, eight PLA WJQ-308 shovels, two PLA TBR-115 VHF radios, and four SHR-PLV200 portable infrared night-vision systems. R. 64 at 2-6.

Defendant's willingness to facilitate, without hesitation, the murder of Peruvian and American personnel, all for personal profit, combined with the need to deter him and others like him, warrants a lengthy sentence under 18 U.S.C. § 3553(a). The safety of our nation's soldiers and government personnel, wherever stationed, as well as those of our international partners, requires the dismantling of the international black market for deadly military weapons, which cannot be accomplished without severe sentences for defendants and others like him.

But for defendant's acceptance of responsibility and cooperation, defendant faced a mandatory minimum sentence of 25 years' imprisonment. Defendant's cooperation provided substantial assistance to the government. His cooperation included providing numerous proffers and grand jury testimony. As a result of his cooperation, and in consideration of the defendant's history and characteristics of the defendant, the seriousness of the offense, the nature and circumstances of the offense,

---

[2] The HN-5 weapons system is an anti-aircraft missile launcher capable of making tail-on engagements against jet aircraft or head-on engagements against propeller-driven aircraft and helicopters under visual aiming conditions. R. 2 at 4; R. 64 at 5; *see also* GV at 7-9.

[3] "PLA" is an abbreviation for China's People's Liberation Army.

specific and general deterrence, and just punishment, the government recommends a sentence of 180 months' imprisonment.

*Procedural History*

### Criminal Complaint

On July 27, 2012, the government charged defendant through a two-count criminal complaint alleging that he attempted to provide material support or resources to a foreign terrorist organization, namely Shining Path (Count One), and he knowingly acquired, transferred, and exported parts designated for use in assembling and fabricating an anti-aircraft missile system (Count Two), violations of Title 18, United States Code, Section 2339B(a)(1) and 2332g(a)(1)(C), respectively. R. 2. The complaint provides numerous examples of defendants' remarkable candor with the undercover agent regarding his access to the technology, his knowledge (and lack of concern) that the equipment would be used to kill Peruvian and U.S. personnel and support terrorism, his interest in expanding his market, his ability to obtain non-traceable military equipment, and his recommendations for the purported end-user to be more operationally savvy to avoid detection from "their opponent." *See e.g.* R. 2 at ¶¶ 17, 20, 21, 22, 23, 29, 32, 34, 36, 37, 38, 40, 41, 46, 51, 53, 56, 57, 59, 65, 66, 68; R. 64 at 2-6.

### Information

On July 31, 2013, the U.S. Attorney filed a one-count information charging defendant with knowingly attempting to provide material support and resources to Shining Path, in violation of Title 18, United States Code, Section 2339B(a)(1). R. 46.

3

### Guilty Plea

On April 23, 2014, defendant pleaded guilty to Count One of the Information. R. 64. Pursuant to the plea agreement, defendant stipulated to the conduct charged as Count Two of the criminal complaint, specifically, knowingly acquiring, transferring, directly and indirectly, and exported parts designed for use in assembling and fabricating an anti-aircraft missile system, namely five thermal batteries, in violation of Title 18, United States Code, Section 2332g(a)(1)(C). R. 64 at 4-6. Had defendant been convicted of this stipulated offense, defendant would have been subject to a 25-year mandatory minimum sentence. 18 U.S.C. § 2332g(c)(1).

As part of his plea agreement, defendant agreed to cooperate. R. 64 at 11. Defendant has met his cooperation obligations, and as a result, the government has agreed to recommend a sentence of 180 months' imprisonment. *Id.*

#### *Maximum Potential Sentence*

As a result of defendant's conviction on Count One, a violation of Title 18, United States Code, Section 2339B(a)(1), he faces a maximum sentence of 180 months' imprisonment. PSR 21.[4] Defendant also faces a potential fine of not more than $250,000, and a term of supervised release of any term of years, including life. 18 U.S.C. §§ 3571(b), 3583(j) and 2332b(g)(5)(B). PSR 21-22.[5]

---

[4] Section 2339B has since been amended. The statutory maximum sentence is now 20 years.

[5] According to the PSR, defendant is only eligible for a maximum three-year term of supervised release. PSR 21-22. Pursuant to Title 18, United States Code, Sections 3583(j) and 2332b(g)(5)(B), the government disagrees with the PSR in paragraph 86.

4

*Sentencing Guidelines: Offense Level Calculation*

The November 2016 edition of the Guidelines Manual governs the calculation of the advisory Guidelines range. R. 64 at 7-11; PSR 10-13.[6] Defendant does not challenge Probation's calculation of the advisory Guideline range.

In accordance with Guideline §1B1.2(c), defendant's stipulated offense is treated as if he was convicted of the offense. PSR 10. Pursuant to Guideline §3D1.2(b), Count One and the stipulated offense group. PSR 11. Pursuant to Guideline §3D1.3(a), the offense level to be used is the highest offense level in the Group. PSR 11. The following charts summarize the government's calculation of the applicable offense levels of the Group:

**Offense of Conviction – Guideline Section 2M5.3**

| U.S.S.G. § | Summary | Assigned Level |
|---|---|---|
| §2M5.3(a) | Base Offense Level | 26 |
| §2M5.3(b) | Offense involved provision of material support with the intent, knowledge, or reason to believe it was to be used to commit or assist in the commission of a violent act | +2 |
| §3A1.4(a) | Terrorism enhancement | +12 |
| §3E1.1(a), (b) | Acceptance of responsibility | -3 |
| | **Total** | **37** |

**Stipulated Offense – Guideline Section 2K2.1**

| U.S.S.G. § | Description | Assigned Level |
|---|---|---|
| §2K2.1(a)(5) | Base Offense Level[7] - the offense involved a firearm described in 26 U.S.C. § 5845(a) | 18 |

---

[6] The PSR was prepared on February 20, 2015, prior to the effective date of the November 2016 Guidelines Manual.

[7] The government incorrectly listed the base offense level for the stipulated offense in the plea agreement (R. 64 at 8) and the Government's Version (GV 6) as 12. The government's calculation and Probation's calculation also differ in the application of Guideline § 2K2(b)(1)

5

| §2K2.1(b)(3)(A) | Destructive device that is a portable rocket, a missile | +15 |
|---|---|---|
| §2K2.1(b)(4)(B) | Altered or obliterated serial number | +4 |
| §2K2.1(b)(5) | Trafficking | +4 |
| §2K2.1(b)(6) | Possessed or transferred any firearm with knowledge, intent or reason to believe that it would be used or possessed in connection with another felony offense | +4 |
| §3A1.4(a) | Terrorism enhancement | +12 |
| §3E1.1(a), (b) | Acceptance of responsibility | -3 |
| | **Total** | 54 |
| | **Net** | 43[8] |

### *Sentencing Guidelines: Criminal History Category*

Although defendant has zero criminal history points, pursuant to Guideline § 3A1.4(b), because defendant's conviction was a felony and he intended to promote a federal crime of terrorism, defendant shall be treated as a criminal history category VI. PSR 14.[9]

### *Sentencing Guidelines: Advisory Guidelines Range*

Because defendant's net offense level is 43, and he qualifies as a Criminal History Category VI, his advisory Guidelines range is life. However, because the statutory maximum term of imprisonment is 180 months, defendant's advisory Guideline range becomes 180 months, pursuant to Guideline § 5G1.1(a).

---

(the number of firearms). Because the offense level exceeds the statutory maximum sentence and the highest offense level, these issues are moot. Defendant did not contest these issues.

[8] Pursuant to Guideline Chapter 5, Part A(comment n.2), "[a]n offense level of more than 43 is to be treated as an offense level of 43."

[9] If defendant was treated as having a Criminal History Category I, his advisory guideline range would still be life (offense level 43), which would then be reduced to an advisory Guideline sentence of 180 months' imprisonment because of the statutory maximum sentence. *See* Guideline §5G1.1(a). Moreover, even ignoring defendant's stipulated offense conduct and ignoring his status as a criminal history category VI, defendant's advisory Guideline range still would be 210 to 260 months' imprisonment (offense level 37 for Count One), again reduced to 180 months' imprisonment because of the statutory maximum sentence.

*Sentencing Analysis in Accordance with Section 3553(a)*

As set out in Title 18, United States Code, Section 3553(a), the Court must consider several factors in determining the sentence, including but not limited to the history and characteristics of Li, the nature and circumstances of the offense, and the need for the sentence imposed to reflect the seriousness of the offense, provide adequate deterrence, protect the public, and to provide just punishment.

Before addressing the Section 3553 factors, the government first responds to defendant's arguments that the government engaged in sentencing entrapment and that he deserves a downward departure for aberrant behavior.

### The Government Did Not Engage in Sentencing Entrapment or Manipulation and Defendant Merits No Relief Based on the Investigation

To support his claims of sentencing entrapment, defendant primarily relies on Guideline § 5K2.12 and *United States v. Turner*, 569 F.3d 637 (7th Cir. 2009). Defendant's arguments on sentencing entrapment appear to confuse sentencing entrapment and sentencing manipulation. Neither are applicable in defendant's situation nor are they even remotely supported by the record.

In *Turner*, the Seventh Circuit re-affirmed its position that the Seventh Circuit "does not recognize the sentencing manipulation doctrine." *Turner*, 569 F.3d at 641. In rejecting a sentencing manipulation claim the Seventh Circuit noted it defers to the discretion of law enforcement:

> We will defer to the discretion of law enforcement to conduct its investigations as it deems necessary for any number of reasons, including, for example, to ensure that there is sufficient evidence to obtain a conviction, to obtain a 'greater understanding of the nature of the criminal enterprise,' and to ensnare coconspirators.

7

*Id.*, quoting *United States v. Garcia*, 79 F.3d 74, 76 (7th Cir. 1996)

The Seventh Circuit in *Turner* also rejected a finding of sentencing entrapment and held that "[t]o succeed on such a claim . . . a defendant must pass a high bar . . . [he] must show (1) that he lacked a predisposition to commit the crime, and (2) that his will was overcome by 'unrelenting government persistence.'" *Id.*, quoting *United States v. Gutierrez-Herrera*, 293 F.3d 373, 377 (7th Cir. 2002).

Pursuant to Guideline § 5K2.12, a defendant may be eligible for a downward departure,"[i]f the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense." According to § 5K2.12, "[o]rdinarily coercion will be sufficiently serious to warrant a departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from unlawful action of a third party or from a natural emergency."

In short, defendant's citation to Guideline § 5K2.12 and *Turner* is unsupported by defendant's own claims or the record before the Court. Defendant has not offered any evidence that establishes that the government acted aggressively (let alone too aggressively) or inappropriately in any way, that the defendant "lacked a predisposition to commit the crime," or that the government engaged in "unrelenting government persistence." Defendant offers no evidence that supports a conclusion that the government should be deterred from engaging in these investigation techniques in the future by awarding the defendant a sentence lower than otherwise warranted.

8

Further, defendant ignores the fact that it was his company, Northwest Technology Company,[10] which initiated contact with the undercover agent in an effort to purchase gyroscopes. R. 2 at ¶¶ 5, 8. Defendant also fails to acknowledge that the conversation regarding the purchase of the MANPAD batteries started with Individual A and not the defendant, and it was the defendant who got involved with the undercover agent on his own and not at the behest of the government. *Id.*at ¶¶ 9, 10, 11.

The subsequent negotiations between the defendant and the undercover agent occurred over a lengthy period of time, primarily by email (and from thousands of miles apart), during which time defendant had numerous opportunities to back out of the deal after learning of the end-user and its intended use of the sophisticated military components that he could acquire. R. 2; R. 64 at 2-6. Defendant points to no evidence of pressure, duress, or unusual benefit that influenced defendant. There is no evidence that the government exploited the defendant in any way or engaged in any misconduct that requires an otherwise lower-than-necessary sentence.

Simply, the record establishes that the defendant sought to profiteer from his access to sophisticated Chinese military equipment knowing that his effort would be used to murder and support terrorism. *See* R. 2 and R. 64 at 3, 5. For example, after being told the end-user intended to carry out "operations/attacks against the Peruvian and US military personnel" and that the end-user user had "shot down a Peruvian helicopter," defendant responded in-part:

---

[10] *See* PSR at ¶20.

9

> This meeting with your customer proved to be useful. Since after this meeting, we will have a better insight about their operation and so we can come up with better idea on the selection of the right equipment for them. I will have a more detail discussion with a PLA military company about the selection of suitable equipment. . . . For the end-user operation. I guess they shot down the helicopter by HN-5B or some other multiple rocket launcher. So, we can think of some equipment to target helicopter as well.

R. 2 at ¶ 29. Defendant was not someone who lacked predisposition or was a "low-level intermediary" merely arranging sales of equipment. The government should and must seek out international businesspersons who are willing to facilitate terrorist organizations or other rogue actors who seek deadly technology. Lengthy sentences are necessary to disrupt illicit trade practices and disincentivize businesspersons, like the defendant, who are willing deal with rogue actors and subvert U.S. and international law, especially when they know the products are destined to be used to murder and to attack the United States or its allies.

### Defendant's Offense Conduct Does Not Constitute Aberrant Behavior

Defendant also seeks a downward departure for aberrant behavior pursuant to Guideline § 5K2.20. Br. 8. To qualify for the aberrant behavior departure, the defendant must have "committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." As described in detail in the complaint, the factual basis of the plea agreement, the Government's Version, and the PSR, defendant does not qualify for the aberrant behavior departure for several reasons.

First, defendant's offense conduct was not limited to a single criminal

10

occurrence. *See* R. 64 at 2-6, R. 2. Rather, with the understanding that the following items would be used by Shining Path to murder, defendant procured and arranged five separate shipments of: (1) the five thermal batteries for the MANPAD system; (2) eight PLA Type 99 Paratrooper Assault Harnesses; (3) eight PLA 65 Paratrooper Backpacks; (4) eight PLA WJQ-308 shovels; (5) two PLA TBR-115 VHF radios; and (6) four SHR-PLV200 portable infrared night-vision systems. R. 64 at 3-6.

Second, defendant's offense conduct involved significant planning in that he procured and trafficked internationally in the above-referenced items knowing that they were for the benefit of terrorists. R. 2; R. 64 at 3-6. Moreover, defendant also took measures to evade law enforcement. *See e.g.* R. 2 at ¶¶ 12, 24, 25, 46.

Third, defendant's offense conduct took place over the course of a year.

Fourth, while defendant lacks any prior convictions, defendant did not have an otherwise law-abiding life. For example, as discussed in paragraph 37 of the complaint, defendant, knowing the end user was a foreign terrorist organization, emailed the undercover and offered access to anti-tank rockets in case the undercover's purported client needed to target tanks or armored vehicles:

> For the end-user operation, they might need to target tank or fleet of armored vehicle. The equipment is
> -portable anti-tank
> -anti-armored vehicle.
> Please discuss with the enduser and check which one is useful. . . If the customer need more of this anti-tank equipment, we might focus to export more of this equipment.

R. 2. at ¶ 37. Offering assistance with targeting tanks and armored vehicles outside of international and U.S. law is not an otherwise law-abiding life. *See also* R. 2 at

11

¶ 56 ("Throughout the remainder of 2011 and continuing to in or around July 2021, Li and the UC continued to communicate about thermal batteries, as well as other equipment, including RPG[11] launchers, automatic grenade launchers, 35 mm ammunition, the QW-1 MANPAD system, and two different types of armor-piercing ammunition").

Defendant even concedes (through remarkably minimized) that he did not lead an otherwise law-abiding life: "Mr. Li was already engaged in the business of brokering deals for various equipment, a small portion of which may have been in violation of other nations' laws" and "[y]es, he was willing to sell products that might be illegal in certain nations." Br. 5, 7.

### **History and Characteristics of the Defendant**

Defendant's sentence should reflect his history and characteristics, both as they aggravate and mitigate his offense conduct. In mitigation, this Court should consider defendant's acceptance of responsibility and his cooperation. His cooperation was important, timely, and productive. His cooperation assisted in the prosecution of three other defendants for crimes including conspiracy and violations of the International Emergency Economic Powers Act. His cooperation also assisted in the investigation of another individual.

In aggravation, this Court should consider his lack of respect for life and international law, and his willingness to support terrorism simply for his pecuniary benefit. *See e.g.* R. 2; R. 64 at 3-6.

---

[11] RPG is an abbreviation for a rocket-propelled grenade.

### Seriousness of the Offense and Nature and Circumstances of the Offense

The circumstances and seriousness of the offense are evident from the complaint and the factual basis of the plea. R. 2 and R. 64 at 3-6. Defendant was in the business of helping others obtain illegal military equipment on the international black market, a business that obviously and inevitably leads to deaths of innocent civilians and members of the military. Defendant's conduct in this case was consistent with his willingness to facilitate killing and the destabilization of governments, all for some quick profit. The Court need look no further than defendant's own statements to assess the seriousness of his conduct and his callousness.

Although defendant was not successful in delivering sophisticated military equipment to a terrorist organization, it was not for his lack of effort, desire, and abilities. For example, on or about June 8, 2011, after being told "the end user spoke in general for their need to defeat and destroy the local Peruvian and US forces operating in their area . . . I know that there are some US military helicopters/aircraft in Peru staffed with US military advisors," defendant responded:

> It was good to know that we just find the equipment just right on time, then we can provide the whole package to the end-user. You are right, we will need to 'educate' the end-user on what type of equipment for them. . . .pls recommend below system . . . this system can also target armed helicopter, so should be good for them.

R. 2 at ¶¶39, 40.

13

Defendant even proactively marketed his ability to obtain equipment, namely thermal imaging equipment for Shining Path, which would "enhance [Shining Path's] mobility in day or night:"

> [W]e propose to promote the Thermal Imager in South American market, since we are associated with several major China Thermal Imager producer, we have team up with some supplier in China and successfully penetrate the market in other region of the World. I believe your customer [Shining Path] will be interested in such equipment, since they will have a lot of activities in the tropical jungle area. This item will enhance their mobility in day or night. . . .

R. 2 at 65.

### **Providing Adequate Deterrence and Just Punishment**

A lengthy term of imprisonment is necessary in order to provide adequate general and specific deterrence, and to reach a just punishment. The government recommends a sentence of 180 months' imprisonment (following cooperation and acceptance of responsibility) to deter international businesspersons from doing business with terrorists and hostile regimes subject to U.S. and international sanctions, particularly when, as here, those businesspersons know that they are facilitating murder.

Lengthy sentences, even in sting cases when the defendant's intent is not fulfilled, increase the cost of doing business with prohibited persons and entities. Sentences such as 180 months' imprisonment for arms traffickers will chill the market and make it more difficult for rogue states and actors to obtain the equipment they need to kill innocents and strike government institutions.

Moreover, a lengthy sentence is necessary to achieve just punishment. Defendant had no reservations about facilitating terrorism in exchange for profit. A

14

sentence of 180 months' imprisonment will discourage those like defendant from attempting similar transactions and it will prevent him from returning to arms trafficking upon his release. If defendant is released upon sentencing, or even shortly thereafter, he will return to China at a relatively young age with no restrictions on his ability to reengage in arms trafficking, except that he will be empowered by the lessons he learned from being caught. Defendant offers no reason to believe he will refrain from returning to the business he knows.

### *Supervised Release*

The government agrees with Probation's proposed terms of Supervised Release as suggested in the Supplemental Report dated June 30, 2015.

### *Conclusion*

Accordingly, the government respectfully requests that this Court impose a sentence of 180 months' imprisonment followed by 10 years of supervised release.

        Respectfully submitted,
        JOEL R. LEVIN
        Acting United States Attorney

By:   *s/ Matt Hiller*
      R. MATTHEW HILLER
      Assistant United States Attorney
      219 S. Dearborn Street
      Chicago, Illinois 60604
      (312) 697–4088